## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
### FIRST JUDICIAL DISTRICT AT JUNEAU

R.L., through her guardians Butch Laughlin )
and Sarah Dunlap, S.W., through his )
guardians Peter Hudson and Kathleen )
Donohoe, G.G, through his guardian, )
Delores Jesus, and K.Y., through her )
guardians Henry Moore and Estella )
Martin, )

              Plaintiffs, )

v. )

STATE OF ALASKA, DIVISION OF )
SENIOR AND DISABILITIES )
SERVICES and DUANE MAYES, )
in his official capacity as Division Director )

              Defendants. )
                       )

Case no. 1JU-18- 638 CI

RECEIVED

APR 1 1 2018

Attorney General's Office
Juneau

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. Medicaid's Home and Community Based Waiver program provides severely disabled Alaskans with services to live in their own homes instead of professionally-run institutional facilities. Day habilitation is one such service that allows intellectually and developmentally disabled adults access to community settings to build self-help, socialization, and adaptive skills. In 2017, the State defendants, in an effort to cut costs, enacted a regulation imposing a "soft cap" of 12 hours per week of day habilitation per person, with an exception for those who are at risk of institutionalization and have a health and safety need for additional hours. In practice however, the State has imposed a hard cap, denying exceptions

LAW OFFICES OF
ALASKA LEGAL SERVICES CORPORATION
8300 Glacier Highway #225
Juneau, AK 99801
(907)586-6425
Fax: (907) 586-2449

R.L. et al. v. State
Case 1:18-cv-00004-HRH   Document 1-1   Filed 05/11/18   Page 1 of 33
Defendant's Exhibit 1 - Page 1 of 33

1     to the plaintiffs and 96% of Waiver recipients who requested services in excess of
2     the "soft cap" to maintain their existing level of habilitation services.

3   2.   The new day habilitation regulation suffers from fatal flaws. First, the State
4     implemented the cap before getting the necessary federal approval to do so, and
5     without undergoing the requisite public notice and comment. Additionally, even
6     if the appropriate procedures were followed, the cap has substantive defects.
7     Although the State assured the public that there would be a transition plan for
8     Waiver recipients facing service cuts, that "transition" has simply been getting a
9     denial letter. The State also failed to provide any criteria to recipients to document
10     how they could meet the exception to the cap. The stringency of the cap frustrates
11     the purpose of the day habilitation service as a whole, and violates the ADA
12     "integration mandate" by hindering the ability of disabled adults to remain in the
13     most integrated setting appropriate to their needs, and penalizing those individuals
14     whose disabilities are too severe for them to function without 1:1 support. The
15     State's claim that service cuts can be offset by family and friends substituting for
16     professional care providers also violates a federal regulation prohibiting the
17     compulsion of family members and other unpaid supports who have not
18     volunteered to assume those responsibilities.

21   3.   Because the State's implementation of the "soft cap" on day habilitation
22     jeopardizes the plaintiffs' health and safety and threatens their ability to remain at
23     home, plaintiffs seek declaratory and injunctive relief to block the State from
24     implementing the new "soft cap" regulation against them.

*R.L., et al v. State*         2

**Defendant's Exhibit 1 - Page 2 of 33**

## JURISDICTION AND VENUE

4. This Court has jurisdiction under AS 22.10.020 (c) and (g).

5. Venue is proper under AS 22.10.030 and Civil Rule 3(c).

## PARTIES

6. The Division of Senior and Disabilities Services (SDS) is the agency within the Alaska Department of Health and Social Services that administers the state Medicaid Waiver programs, including the Intellectual and Developmental Disabilities (IDD) Waiver.

7. Defendant Duane Mayes is the Director of the Division of Senior and Disabilities Services and he is sued in his official capacity.

8. This Complaint refers to the defendants collectively as "the State."

9. R.L. is a 45-year old intellectually disabled, non-verbal woman with a seizure disorder who needs 24-7 care and has received such care through the Medicaid IDD Waiver since its existence in Alaska; the State is in the process of cutting her day habilitation services from 25 to 12 hours per week. Butch Laughlin and Sarah Dunlap are R.L.'s co-guardians.

10. S.W. is a 29-year old developmentally disabled, non-verbal, deaf-blind man with a seizure disorder and severe behavioral issues who also needs 24-7 care and has received such care through the Medicaid IDD Waiver for his entire adult life; the State is in the process of cutting his day habilitation services from 40 to 12 hours per week. Peter Hudson and Kathleen Donohoe are S.W.'s co-guardians.

*R.L., et al v. State*                     3

11.     G.G. is a 62-year old intellectually disabled man with cerebral palsy who has lived with his family in Alaska for the past ten years with the help of the Medicaid IDD Waiver; the State is in the process of cutting his day habilitation services from 23 to 12 hours per week. Delores Jesus is G.G.'s guardian.

12.     K.Y. is a 29-year-old disabled woman who has been diagnosed with intellectual disability and myotonic dystrophy and who receives services under the State's IDD Waiver program. Henry Moore and Estella Marin are K.Y.'s co-guardians. The State is currently in the process of cutting K.Y.'s day habilitation services from 26 to 12 hours per week.

## FACTUAL ALLEGATIONS

**A. Federal Medicaid Law**

13.     The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, authorizes federal financial support to states for medical assistance to low-income people who are aged, blind, disabled, or members of families with dependent children. The federal and state governments jointly fund Medicaid benefits. States administer Medicaid by defining eligible beneficiary groups, types and ranges of services, payment level for services, and administrative rules.

14.     State participation in the Medicaid program is voluntary. However, once a state chooses to participate in the Medicaid program, it must comply with all federal statutory and regulatory requirements governing the program. Alaska, like all states, has chosen to participate in the Medicaid program.

15.     Section 1915(c) of the Social Security Act permits a state to waive certain Medicaid requirements in order to furnish an array of home and community-based services (HCBS) that promote community living for Medicaid beneficiaries who

*R.L., et al v. State*           4

1  would otherwise be qualified to get care through a nursing home or other
2  institutional facility.

16. A state seeking to obtain a home and community-based Waiver must submit an
    initial Waiver application to the U.S. Center for Medicare and Medicaid Services
    (CMS), acting on behalf of the Secretary of Health and Human Services,
    describing the Waiver program design and how it will meet statutory and
    regulatory requirements.

17. After the initial three-year approval period, each state operating a Waiver must
    submit a five-year Waiver renewal application.

18. A state must implement the Waiver as specified in the approved application.

19. If the state wants to change the Waiver while it is in effect, it must submit an
    amendment to CMS for its review and approval.

20. Federal regulations provide that substantive Waiver amendments, such as
    limitations to Waiver services, may not got into effect retroactively. 42 C.F.R.
    §441.304(d).

**B. Updates to Federal Medicaid Law in 2014**

21. In 2014, CMS issued a new regulation (42 C.F.R. §441.301(c)(6)) that requires all
    Medicaid-funded services be provided in settings that exhibit home and
    community-based characteristics and do not isolate recipients; the regulation
    highlights the need for recipients to have opportunities to engage in community
    life, have full access to benefits of community living, and opportunities to receive
    services in the community to the same degree as other non-disabled people.

*R.L., et al v. State*                                  5

22. The new rule ensures that states use home and community-based services Waiver funding for programs that truly work to integrate people with disabilities into the community at every opportunity.

23. The 2014 regulation also requires a "person-centered service plan" for each recipient, which reflects the services and supports that are important for the individual to meet his or her assessed functional needs, as well as what is important to the individual with regard to preferences for the delivery of such services and supports.

24. Among other requirements, the person-centered plan must describe the services and supports that will assist the individual to achieve identified goals, and list the providers of those services and supports, including "natural supports," defined as "unpaid supports that are provided voluntarily to the individual in lieu of 1915(c) HCBS Waiver services and supports."

25. Agency Commentary on the regulation clarifies with respect to the "voluntarily" aspect of natural supports that: "[t]he planning process must not compel unpaid services." 79 Fed Reg. 11 (Jan. 16, 2014).

## C. Alaska's Home and Community Based Waiver Program

26. The Alaska Legislature has implemented this state's Medicaid program so that "needy persons of this state who are eligible for medical care at public expense . . . should seek only uniform and high quality care that is appropriate to their condition and cost-effective to the state and receive that care, regardless of race, age, national origin, or economic standing." AS 47.07.010.

27. Alaska's HCBS 1915(c) Waiver programs support the independence of Alaskans who experience physical or developmental disabilities by providing services in their homes and community rather than in institutional settings such as a nursing home.

28. The goal of the Waiver programs is to provide effective home and community-based supports in the amount, duration, scope, and frequency that will allow individuals to live as independently as possible in integrated community settings.

29. The Alaska Department of Health and Social Services Division of Senior and Disabilities Services (SDS) operates Alaska's Waiver programs.

30. Applicants access their Waiver supports via private SDS-certified care coordinators, who -- in coordination with the individual, family, and other team members - draft annual Plans of Care detailing the various services that are needed to maintain the health and safety of the recipient, and to allow them to remain in their own home.

31. SDS is responsible for exercising routine oversight of the Plan of Care to ensure that plans address assessed clinical and support needs; reflect the recipient's strengths and preferences for the delivery of services and supports; identify the elements important to the recipient to achieve the quality of life the recipient wishes, including the recipient's goals and desired outcomes; identify the services and supports, paid and unpaid, that will assist the recipient to achieve the recipient's goals and desired outcomes; identify the providers of services and supports; identify the amount of services needed; document the service options

considered by the recipients; discuss risk factors; and identify the people responsible for plan monitoring.

32.  SDS-certified home and community-based provider agencies, such as REACH in Juneau, deliver the services in the plan of care that are approved by the State.

## D. Recent Limitations on Waiver Day Habilitation Services

33.  Prior to 2017, the State did not have any cap on day habilitation for recipients living in their own homes and a soft 15 hour per week cap on day habilitation for recipients in group homes.

34.  On April 12, 2017, the State issued public notice of its intent to amend state regulations to implement cost containment measures; these measures included new limits on day habilitation services based on the average use of services across the state.

35.  The regulation provides for a cap on services with a two-part exception: "The department will not pay for more than 624 hours per year of any type of day habilitation services from all providers combined, unless the department approves a limited number of additional day habilitation hours that were (1) requested in a recipient's plan of care; and (2) justified as necessary to (A) protect the recipient's health and safety; and (B) prevent institutionalization."

36.  After notice and comment, the Lt. Governor signed this regulation on August 18, 2017, and it went into effect on October 1, 2017.

37.  Later in October 2017, the State began the process to request CMS approval to approve the soft cap that it had *already* instituted through regulation.

*R.L., et al v. State*                    8

38. The Division's Request for an Amendment to a §1915(c) HCBS Waiver provided for the "soft cap" of 12 hours per week of day habilitation services, but identified an either-or exception for exceeding the cap: "This Waiver amendment places limits on the amount of day habilitation a recipient can receive in one year. . . . The cap is 'soft' in that the regulation allows approval in excess of the limit when requested for individuals who are at risk of institutionalization within 30 days, *or* who have health and safety requirements affected by the limit, if justified in a plan of care or amendment." (emphasis added).

39. Under this written proposal, a Waiver participant could receive hours above the cap if *either* one of two conditions apply: (1) the individual is at risk of rapid institutionalization *or* (2) the individual has health and safety requirements affected by the limit – instead of both conditions like the state regulation.

40. The State provided public notice of the proposed IDD Waiver amendment on October 24, 2017, including a copy of the proposed amendment, which contained the "or" standard, and opened public comment through November 27, 2017.

41. Public notice on October 24, 2017 included letters and emails to all tribal organizations, advertisements in the state's largest newspaper, the State's Online Public Notice system, an E-Alert email sent to 1700+ subscribers, posting on the SDS website, and availability in all three SDS offices.

42. The State issued invitations for tribal consultation on the proposed amendment on October 23, 2017.

43. The State formally submitted its Request for an Amendment to CMS on January 4, 2018, and asked for an effective date of March 1, 2018.

*R.L., et al v. State*  9

44. CMS did not approve the State's requested amendment, including the service limits on day habilitation, until March 20, 2018.

45. Although 42 C.F.R. §441.304(f)(2) provides that "[a] request for an amendment that involves a substantive change as determined by CMS, may only take effect on or after the date when the amendment is approved by CMS," the State began implementing the cap six months before CMS approval.

46. The State began implementing the day habilitation cap in October 2017, requiring recipients to prove both health and safety necessity *and* risk of institutionalization to receive day habilitation hours above the "soft cap."

47. Upon information and belief, defendant Duane Mayes, Director of Senior and Disabilities Services, reported in February 2018 that since the soft cap regulation went into effect there have been 116 plan of care requests for day habilitation services over the cap – including the plaintiffs - and the State issued denial letters in 111 cases.

48. Upon information and belief, the State cut hours in these 111 cases by terminating previously-approved day habilitation hours above the cap, resulting in overall cuts to service plans in each case, such that the cap not only reduced day habilitation services, it reduced Waiver services overall.

**E.     Facts Related to Plaintiff R.L.**

49. R.L. is warm and gregarious but has an IQ below 70 and functions at the level of a two-year old. She commonly experiences several small seizures per week. As a result of her disabilities, R.L. requires 24-7 monitoring. She has severe behavioral

*R.L., et al v. State*                                          10

outbursts and lacks the judgment to protect herself from sharp objects, heat sources, wandering into traffic, and other hazards. She communicates mostly non-verbally, and is also a fall risk due to coordination and balance issues.

50. R.L. has successfully integrated into the community by living in a home with Medicaid-funded around-the-clock professional direct services providers. Her service providers monitor her throughout the day and night to protect her in case of seizures or behaviors that would put her at risk of injury or death.

51. R.L.'s father and step-mother live next door. They both work, but assist with R.L.'s care by monitoring her services, checking in on her regularly, and helping her in a multitude of other ways.

52. R.L. thrives on routine and social interaction, which includes regular outings in the community and 3-4 days per week at REACH's Canvas Art Studio; this routine and level of social interaction help keep her behavioral issues at bay, and in turn reduce the risk of her seriously injuring herself and suffering a serious decline in health.

53. For at least the past nine years, R.L.'s Plan of Care has included 20-36 hours of day habilitation services per week to allow skill-building activities while at Canvas Art Studio and out in the community to visit public places, attend community events, and have other social interactions in Juneau.

54. On November 9, 2017, the Division issued an Adverse Action letter informing R.L. that her day habilitation services would be cut from 25 hours per week to 12 hours per week, including transportation, with no alternative service provided to cover that time, as a result of the new regulation; the letter states that R.L. "may

*R.L., et al v. State*                                        11

only receive a maximum of 12 hours of Day Habilitation per week. The [Plan of Care] lacks sufficient information to justify approval of a request in excess of the regulatory maximum."

55. The letter determined that in light of seizure activity, R.L. could not actually benefit from as many day habilitation hours as she was requesting, despite her utilization of those hours in the past.

56. The letter also determined that R.L. would not be harmed by the reduction of services because her parents are available as natural supports, although the Plan of Care specifically states that they cannot provide care beyond their current level given their employment and their own health issues.

57. R.L. appealed, and that fair hearing is pending before the Office of Administrative Hearings.

**F.    Facts Related to Plaintiff S.W.**

58. S.W. has been blind and deaf since birth. He has cerebral palsy and developmental delays, which limit his communication and cause severe behavioral outbursts. S.W. communicates by using tactual sign language and object symbols – a skill which needs constant effort and development.

59. Medically, S.W. suffers from epilepsy, scoliosis, insomnia, kidney stones, constipation, and tooth erosion.

60. S.W. lived with his father and received services from both him and REACH for many years. When his father passed away from cancer several years ago, his need for professional services increased.

*R.L., et al v. State*                          12

61. REACH has been able to keep S.W. active in the community through direct service providers who assist him with swimming at the pool, walking at the track, outings in Juneau, REACH activities, and activities at his family's church.

62. S.W. needs 24-7 care to protect him from serious injury and death.

63. During a seizure last year, S.W.'s hand was on the floor next to a heater, and he suffered third degree burns which led to emergency services at the Harborview burn unit and amputation of a finger.

64. For many years, S.W.'s Plan of Care has included more than 12 hours of day habilitation time to cover skill-building activities while out in the community walking and swimming and on other outings to build skills.

65. On February 14, 2018, the Division issued an Adverse Action letter informing S.W. that his day habilitation services would be cut from 40 hours per week to 12 hours per week, with no alternative service provided to cover that time, as a result of the new regulation; the letter states that S.W. and his team "have not demonstrated that the request meets the regulatory requirement."

66. The letter also determined that S.W. would not be harmed by the reduction of services because his legal guardians (friends of his late father) are available as natural supports, although the Plan of Care specifically states that their role as legal guardians does not include serving as direct care providers and they have not volunteered as such.

67. S.W. appealed, and a fair hearing is pending before the Office of Administrative Hearings.

Defendant's Exhibit 1 - Page 13 of 33

**G.     Facts Related to Plaintiff G.G.**

68.     G.G. moved to Alaska with his family in 2008 and the IDD Waiver has helped him remain at home with his family – initially with his sister, and then after she died last year, with his niece and her husband.

69.     G.G. is mostly wheelchair-bound, and although he likes to be around people, he communicates mostly with eye gestures and noises which his direct service providers have become familiar with but which are poorly understood by others.

70.     G.G.'s condition is such that he cannot be left alone because he is largely unable to do anything for himself, and he requires 24-hour help with his care and safety needs.

71.     For many years, G.G.'s Plan of Care has included more than 12 hours of day habilitation time per week to cover skill-building activities while out in the community walking, swimming, and attending Canvas.

72.     His medical providers have directed him this past year to walk (with a walker or gait belt) three times a day at REACH or the track, and exercise at the pool to maintain his health, decrease muscle spasticity, prevent muscle deterioration, maintain digestive health and remain emotionally regulated.

73.     G.G. also benefits from fine motor skill development at the Canvas art studio.

74.     G.G.'s plan of care requested preservation of his day habilitation services based on the risk of his losing his musculature and ability to stand, plus his correlated mental health.

75.     On December 29, 2017, the State issued an Adverse Action letter informing G.G. that his day habilitation services would be cut from 23 hours per week to 12 hours

*R.L., et al v. State*                              14

Defendant's Exhibit 1 - Page 14 of 33

per week, with no alternative service provided to cover that time, as a result of the new regulation; the letter states in circular reasoning that since G.G. remained healthy and free from hospitalizations in the prior year (when he received the full amount of day habilitation services) the reduction did not put him at risk of institutionalization.

76. The letter also determined that G.G. would not be harmed by the reduction of services because of his natural supports, although the Plan of Care specifically states his niece and her husband already care for him every night and on weekends, and depend on Waiver services because they work long hours.

77. G.G. appealed and his niece appeared at the fair hearing without representation.

78. G.G. lost the fair hearing because the administrative law judge (ALJ) found that the regulation required him to show that the day habilitation reduction would affect his health and safety *and* put him at risk of institutionalization, and found that his niece's testimony regarding health and safety needs did not prove risk of institutionalization.

79. Through counsel, G.G. asked the Commissioner to vacate the ALJ decision based on irregularities in the state Waiver amendment process, namely the discrepancy between the regulation's two-part exception to the cap, and the Waiver plan amendment's either-or exception to the cap.

80. The Commissioner remanded the case back to the ALJ to decide the case after litigation on the irregularities is completed in two separate administrative appeals.

**H.    Facts Related to Plaintiff K.Y.**

81.    Plaintiff K.Y. currently resides with her father and co-guardian, Henry Moore, in Anchorage. She was diagnosed with a developmental delay in early childhood. Specifically, she was diagnosed with congenital (type 1) myotonic dystrophy, which is the early childhood form of myoclonic dystrophy, a progressive disease characterized by weak muscle tone, inward/upward turning feet, breathing problems, delayed development, intellectual disability, and a shortened life expectancy of about 45 years.

82.    Due to her disability, K.Y. has difficulty maintaining attention and is slow to learn new skills. Her information processing speed and working memory are both extremely low and make it difficult for her to process information efficiently. She needs a consistent level of staff support and intervention with decision-making and planning. She requires constant supervision and cannot safely be left alone for more than a few minutes. She needs assistance and prompts for her personal hygiene and adult daily living skills.

83.    K.Y. also struggles to initiate conversations with peers. As a result, she is at risk for social isolation. Without continual staff intervention, K.Y. would socially isolate herself as much as 95% of the time.

84.    K.Y. has been a recipient of IDD Waiver services for approximately the past 3 years. During this time, she has received 26 hours per week of day habilitation services. K.Y.'s day habilitation services have allowed her to work on and develop independent living and social communication skills (such as initiating or joining conversations, making appropriate eye contact, using the name of the

person to whom she is speaking, and taking turns in conversation) in order to decrease her social isolation. She has participated in physical activities, such as hiking, swimming, sports and games. She has also participated in various creative and expressive activities, such as arts, crafts, and scrapbooking.

85. On March 28, 2018, Defendants issued an Adverse Action letter informing K.Y. that her day habilitation services would be cut from 26 hours per week to 12 hours per week, with no alternative service provided to cover that time, as a result of the new regulation. The letter simply states in conclusory terms that K.Y.'s request for day habilitation hours in excess of the 12-hour "soft cap" was denied because K.Y. "has not demonstrated that the request meets the regulatory requirement." The letter does not otherwise set forth the factual reasons why the State denied K.Y.'s request for additional day habilitation hours.

## FIRST CAUSE OF ACTION AGAINST DEFENDANT MAYES: VIOLATION OF 42 C.F.R. §441.304(d) DURATION, EXTENSION, AND AMENDMENT OF A WAIVER

86. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

87. Defendant Mayes is a "person" subject to liability under 42 U.S.C. § 1983.

88. Plaintiffs' right to receive the Medicaid Waiver benefits to which they are entitled is a right secured by the laws of the United States, including, but not limited to, the Medicaid Act.

*R.L., et al v. State*                    17

89. In violation of 42 U.S.C. § 1983, defendant Mayes has subjected plaintiffs to the deprivation of their rights under color of state law.

90. 42 C.F.R. §441.304(d)(2) states that, with regard to state Waiver plans, "A request for an amendment that involves a substantive change as determined by CMS, may only take effect on or after the date when the amendment is approved by CMS."

91. Subsection (d)(1) defines a substantive change as including but not limited to: "revisions to services available under the Waiver including elimination or reduction of services, or reduction in the scope, amount, and duration of any service, a change in the qualifications of service providers, changes in rate methodology or a constriction in the eligible population."

92. Here, defendant Mayes began enforcing a service limit on day habilitation via a change in state regulation in October 2017, before he received the necessary approval from CMS to implement the service limit on March 20, 2018.

93. By reducing Waiver services when the Waiver amendment was still pending and not yet approved, defendant Mayes violated the Medicaid Act and its implementing regulations.

94. As direct beneficiaries of the IDD Waiver program, plaintiffs have suffered harm as a result of defendant Mayes imposing a service limit to day habilitation prior to CMS approval.

95. Plaintiffs are entitled to injunctive relief vacating their reduction notices that were issued prior to the effective date of CMS's approval of the amendment to the State's IDD Waiver plan.

## SECOND CAUSE OF ACTION AGAINST DEFENDANT MAYES: VIOLATION OF 42 C.F.R. §441.304(f) DURATION, EXTENSION, AND AMENDMENT OF A WAIVER

96.  Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

97.  42 C.F.R. §441.304(f) requires a public notice and comment period for any changes in the services or operations of a state's Waiver plan.

98.  The notice and comment regulation has four components: (1) This process must be described fully in the State's Waiver application and be sufficient in light of the scope of the changes proposed, to ensure meaningful opportunities for input for individuals served, or eligible to be served, in the Waiver; (2) This process must be completed at a minimum of 30 days prior to implementation of the proposed change or submission of the proposed change to CMS, whichever comes first; (3) This process must be used for both existing Waivers that have substantive changes proposed, either through the renewal or the amendment process, and new Waivers; and (4) This process must include consultation with federally-recognized Tribes, Indian health programs and Urban Indian Organizations.

99.  With regard to the new limit on day habilitation, defendant Mayes first conducted public notice and comment on the change to state regulation beginning in April 2017, and then conducted public notice and comment on the change to the state Waiver plan, beginning in October 2017.

100.  The text of the proposed Waiver amendment circulated in October 2017 contained a different standard for meeting the exception to the "soft cap:" instead of having

*R.L., et al v. State* 19

to show both a health/safety need *and* risk of institutionalization, a recipient could get hours above the cap if *either* one of the two conditions were met: (1) the individual is at risk of rapid institutionalization *or* (2) the individual has health and safety requirements affected by the limit.

101. All of the postings, letters, emails, and publications about the Waiver amendment beginning on October 24, 2017 contained the "or" standard for the "soft cap."

102. However, when defendant Mayes began implementing the cap on October 1, 2017, he implemented it with the more restrictive "and" standard.

103. The reduction letters to the plaintiffs all applied the "and" standard to reduce their day habilitation services.

104. When defendant Mayes was notified about the discrepancy between the standards in the state regulation and the Waiver amendment on March 6, 2018, he simply informed CMS that the discrepancy was a "drafting error" and changed the "or" to an "and" in the amendment request without further public notice and comment.

105. Defendant Mayes thus made a substantive change to the Waiver plan amendment circulated in October 2017 in violation of 42 C.F.R. §441.304(f).

106. As direct beneficiaries of the IDD Waiver program, plaintiffs have suffered harm as a result of defendant Mayes imposing a service limit to day habilitation based on a Waiver plan amendment that lacked the required public notice and comment.

107. Plaintiffs are entitled to injunctive relief vacating their reduction notices, and barring future reductions based on the Waiver plan amendment until it has undergone the required public notice and comment.

## THIRD CAUSE OF ACTION AGAINST DEFENDANT MAYES: VIOLATION OF 42 C.F.R. §441.301(c)(v) CONTENT OF REQUEST FOR A WAIVER

108. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

109. Federal regulations define natural supports as supports provided "voluntarily" in lieu of Waiver services and supports.

110. Defendants have reduced day habilitation services to the plaintiffs with the justification that such services can be provided by natural supports instead of paid service providers, despite the person centered plans of care explicitly stating that supporting family members are neither available nor volunteering to substitute for paid providers.

111. Compelling family and friends through service reductions to provide unpaid services contravenes the instructions of federal policy described at 79 Fed Reg. 11 (Jan. 16, 2014).

112. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementing the day habilitation cap in violation of the compelled supports regulation.

## FOURTH CAUSE OF ACTION AGAINST DEFENDANT MAYES: VIOLATION OF AMOUNT, SCOPE, AND DURATION PROVISIONS OF MEDICAID ACT: TRANSITION PLANNING

113. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

114. The Medicaid Act provides that Medicaid services, including Waiver services, must be sufficient in amount, duration and scope to reasonably achieve their purpose. 42 USC 1396a(a)(10)(B); 42 C.F.R. §440.230(b).

115. When a state limits the amount, frequency or duration of Waiver services, it must explain the steps that it will take to ensure that recipients' needs can be met and how the state will continue to assure the Waiver participants' health and welfare.

116. With regard to state Waiver plans, "[a] request for an amendment that involves a substantive change as determined by CMS . . . must be accompanied by information on how the State has assured smooth transitions and minimal effect on individuals adversely impacted by the change." C.F.R. §441.304(d)(2).

117. In implementing the limit on day habilitation services, defendant Mayes offered assurances that: "The transition to a cap on day habilitation will be done at a participant's annual plan of care renewal, which will include a renewed emphasis on natural supports and other programs and services identified through the person-centered planning process."

118. Defendant Mayes also offered assurances that "[g]iven the array of services available to participants in the IDD, APDD, and CCMC Waiver . . . .the reduction in hours would not pose an obstacle to achieving day habilitation's overall purpose of fostering the acquisition of skills, appropriate behavior, greater independence and personal choice."

119. The reduction letters to the plaintiffs echo this same assurance, but without offering any information to the plaintiffs about what other services are actually

available to help them acquire skills, maintain appropriate behavior, increase the independence or have their personal choices met.

120. The "transition" at renewal requirement for the plaintiffs has equated to simply a denial at renewal, with boilerplate language directing IDD recipients to fill the gap in services with voluntary supports (even when the person-centered plan of care identifies there are none) and other services which the State does not identify (even when the person-centered plan of care explains there are no substitute services).

121. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementation of the day habilitation cap unless and until the State includes an actual transition plan for IDD waiver recipients facing the loss of habilitation services in their plans of care.

## FIFTH CAUSE OF ACTION AGAINST DEFENDANT MAYES: VIOLATION OF AMOUNT, SCOPE, AND DURATION PROVISIONS OF MEDICAID ACT: EXCEPTION CRITERIA

122. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

123. In his request to amend the Waiver to impose a limit on day habilitation services, defendant Mayes made assurances that the new cap on day habilitation is "soft" in that the limit can be exceeded when requested for individuals at risk of institutionalization, and that "[t]here is a review process in place for exceptions to the limit."

*R.L., et al v. State*                23

Defendant's Exhibit 1 - Page 23 of 33

124. Defendant Mayes also made assurances that the State would establish specific criteria that it would use to award an individual day habilitation hours above the cap.

125. In practice, defendant Mayes has denied at least 111 out of 116 plans of care of that seek to retain existing day habilitation hours above the cap, such that the "review process" is merely a denial process for all but a few people.

126. Defendant Mayes has failed to create, or at least publicize, criteria to identify what factors will be considered in demonstrating a health and safety risk or risk of institutionalization to justify hours above the cap.

127. Notably, the State's standard fill-in-the-blank plan of care form does not specify what information a recipient must provide to document a risk of institutionalization, and does not even have a section indicating where a recipient would put such information.

128. Even in S.W.'s case, in which he submitted a physician letter attesting that cutting his day habilitation hours places him at risk of institutionalization, defendant Mayes found no documentation of a risk of institutionalization.

129. Because there is no identifiable way for recipients to meet the risk of institutionalization standard, there effectively is no exception process available to the plaintiffs and no mechanism for defendant Mayes to provide a sufficient amount of day habilitation services to them.

130. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementation of the day habilitation cap without an explicit exceptions process that allows for adequate consideration of a recipient's

*R.L., et al v. State*          24

Defendant's Exhibit 1 - Page 24 of 33

individual needs as identified through the person centered planning process, and the need for community integration based on health as opposed to risk of institutionalization.

## SIXTH CAUSE OF ACTION AGAINST DEFENDANT MAYES: AFFORDABLE CARE ACT & IMPLEMENTING REGULATIONS

131.    Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

132.    Section 2402(a) of the Affordable Care Act requires states to develop systems for delivery of home and community-based services and supports that respond to the changing needs of beneficiaries, maximize independence, support self-direction, and achieve a more consistent and coordinated approach to the administration of policies and procedures across states.

133.    The Secretary has implemented Section 2402(a) by enacting regulations on person-centered planning and self-direction.

134.    Federal person-centered planning regulations at 42 C.F.R. §441.301(c)(2) require a process that offers informed choices to individuals regarding the services and supports they receive and from whom, that reflects services and supports that are important for people to meet their particular needs and preferences, and that gives people full access to the greater community, including opportunities to engage in community life and receive services in the community instead of just at home or in a place designed just for disabled people.

135.    Federal settings regulations at 42 C.F.R. §441.301(c)(4) also require that Waiver services setting must be based on a person's individual needs, must give the

*R.L., et al v. State*                                25

person opportunities to engage in community life, and must optimize the person's independence in making life choices, including daily activities.

136. If a person-centered plan identifies a need and desire for day habilitation services in the community, and meeting that need requires more than twelve hours per week, these regulations dictate that the ability to receive those services should not be tethered to an agency finding whether, absent those services, the person will face immediate institutionalization.

137. Targeting this community integration service with a cap based on average utilization rates, as opposed to individual needs, also fails to meet the intent of person-centered planning and ensuring opportunities for individuals to receive their services in a community setting.

138. Compounding this problem, state regulations require that day habilitation hours include transportation time to and from the community day habilitation site, regardless of whether during transportation a person actually engages in "specific, active, habilitative skill-building tasks that support a person to acquire, build or retain skills aimed at increasing the individual's overall level of functioning."

139. Accordingly, plaintiffs' newly-limited 12 hours of day habilitation per week is necessarily taken up in part by the time it takes them to get back and forth to the pool, art studio, or other community setting for a day habilitation activity.

140. The 12 hour limit thus goes beyond limiting skill building outside the home to 12 hours – it limits it to much less because of transportation time.

141. The cap therefore adjusts the focus of services from plaintiffs' individual needs to the statewide average need, and it compromises plaintiffs' opportunities to engage

in community life, and limits their independence in making life choices, including daily activities.

142. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementation of the day habilitation cap without an exceptions process that satisfies the purposes of the person-centered planning and community settings regulations.

## SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS: VIOLATION OF ADA INTEGRATION MANDATE

143. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

144. Regulations implementing the Americans with Disabilities Act provide for an "integration mandate," which calls for public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28.C.F.R. §35.130(d) (1988).

145. The "most integrated setting" is one "that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

146. Under the State's soft cap regulation, an IDD Waiver recipient may (in theory) get an exception to the cap if they provide proof of health and safety requirements affected by the limit and proof that they are at risk of institutionalization.

147. The State defines "institution" as an intermediate care facility (of which there are none in Alaska), and excludes group homes and assisted living homes from that definition.

148. However, the ADA integration mandate requires more than just protection from being involuntarily segregated in a care facility – it protects people from service reductions that push them involuntarily toward group home placement despite a desire to remain in their own homes.

149. By reducing services beyond what was previously in place to maintain 24-7 care for plaintiffs in their own homes, the cap increases the risk of plaintiffs being forced away from their own homes into group homes to have their care needs met.

150. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementation of the day habilitation cap without an exceptions process that considers the risk not only of institutionalization in an Intermediate Care Facility but of losing placement in the most integrated setting appropriate to their needs.

## EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS:

## DISCRIMINATION UNDER THE ADA

151. Plaintiffs reallege and incorporate herein by reference all allegations set forth above.

152. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of services, program, or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

*R.L., et al v. State*                                       28

153. In enacting the ADA, Congress found that "[i]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation . . ." 42 U.S.C. § 12101(a)(5).

154. Regulations implementing Title II of the ADA provide: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

155. Implementing regulations also provide: "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (1) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities. . . " 28 C.F.R. § 35.130(b)(3).

156. Pursuant to the ADA, public entities are required to provide meaningful access to their services, programs, and activities, and provide any accommodations or modifications necessary for people with disabilities to access those services.

157. Defendants are public entities within the meaning of Title II of the ADA.

158. When the State imposed the new limitation on day habilitation, one reason given was that recipients were not living up to its expectations that disabled individuals improve their skills from year to year sufficiently so that they become more independent and use less support services.

Defendant's Exhibit 1 - Page 29 of 33

159. Day habilitation, according to defendant Mayes, should not be permanent: "We'd like to see from year to year a reduction in the number of hours being requested, so the provider is doing their part to teach necessary skills for this individual to be able to do as much as possible independently in their community."

160. The SDS Intellectual & Developmental Disabilities Unit, through Manager Maureen Harwood, has likewise justified the day habilitation cap by criticizing intellectually and developmentally disabled recipients who rely fully on paid support staff, claiming that their dependence contravenes the "integration and independence" and pro-employment purposes of the Waiver.

161. While the Waiver program should support the independence of those disabled individuals who are capable of functioning independently, it cannot discriminate against those whose disabilities are so severe that they cannot participate in the community absent constant 1:1 support, whether it is because of extreme behavioral dysregulation like S.W., or R.L.'s need for redirection and protection from self-harm resulting from her profound intellectual deficits.

162. Imposing service cuts based on an expectation of independence that plaintiffs cannot possibly meet due to their severe disabilities constitutes discrimination on the basis of disability, in violation of the ADA.

163. Plaintiffs are entitled to a temporary injunction and declaratory and injunctive relief from implementation of the day habilitation cap without an exceptions process that allows for adequate consideration of recipient's needs which may exceed the average user's based on their particular disability.

Defendant's Exhibit 1 - Page 30 of 33
Case 1:18-cv-00004-HRH   Document 1-1   Filed 05/11/18   Page 30 of 33

## REQUEST FOR RELIEF

WHEREFORE, the plaintiffs pray for the following relief and remedies from the Court:

(1)     Assume jurisdiction over this action and maintain continuing jurisdiction until defendants are in full compliance with every order of this Court;

(2)     Declare that the "soft cap" regulation limiting Waiver day habilitation services as set forth above violates the Medicaid Act and ADA and implementing regulations.

(3)     Grant a temporary restraining order and permanent injunction under Civil Rule 65 enjoining defendants, their officers, agents, employees, attorneys, and all persons who are in active concert or participation with them from implementing the "soft cap" in 7 AAC 130.260(c); and

(4)     Grant plaintiff the costs of this action and reasonable attorney's fees, and all other and further relief as the Court deems to be just and equitable.

DATED: April 10, 2018

ALASKA LEGAL SERVICES CORPORATION
Attorneys for Plaintiffs

By:

HOLLY HANDLER
Alaska Bar No. 0301006

*R.L., et al v. State*                    31

# IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## FIRST JUDICIAL DISTRICT AT JUNEAU

R.L., through her guardians Butch Laughlin )
and Sarah Dunlap, S.W., through his )
guardians Peter Hudson and Kathleen )
Donohoe, G.G, through his guardian, )
Delores Jesus, and K.Y., through her )
guardians Henry Moore and Estella )
Martin, )
                    )
           Plaintiffs, )
                    )
v. )
                    )
STATE OF ALASKA, DIVISION OF )
SENIOR AND DISABILITIES )
SERVICES and DUANE MAYES, )
in his official capacity as Division Director )
                    )
           Defendants. )

Case no. 1JU-18- 638 CI

**TO:**   Duane Mayes, Director, Senior & Disabilities Services, 550 W. 8th Ave.,

Anchorage, AK 99501

**YOU ARE HEREBY SUMMONED** and required to file with the court a written

answer to the complaint which accompanies this summons. Your answer must be filed

with the court at PO Box 114100, Juneau AK 99811-4100 within 20 days after the day you

receive this summons.

In addition, a copy of your answer must be sent to Plaintiffs' Attorney: Holly

Handler, Alaska Legal Services Corporation, 8800 Glacier Highway #228, Juneau, Alaska

99801. If you fail to file your answer within the required time, a default judgment may be

entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other

parties in this case, in writing, of your current mailing address and any future changes to

your mailing address and telephone number. You may use court form *Notice of Change*

LAW OFFICES OF
ALASKA LEGAL SERVICES CORPORATION
8800 Glacier Highway #228
Juneau, AK 99801
(907)586-6425
Fax: (907) 586-2449

1    *of Address/Telephone Number* (TF-955), available at the clerk's office or on the court

2    system's website at www.state.ak.us/courts/forms.htm, to inform the court.

3        If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

4

5           NOTCE OF JUDICIAL ASSIGNMENT

6

7    To: Plaintiff and Defendant        THIS MATTER IS FORMALLY

8    You are hereby given notice that this case has been assigned to:   ASSIGNED TO   TREVOR N. STEPHENS

9                                        SUPERIOR COURT JUDGE

10   (SEAL)                        CLERK OF COURT

11

12

13      4/10/18          By: _____

14        DATE                          DEPUTY CLERK

15

16

17

18

19

20

21

22

23

24

25

26